

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

ZIPPORAH FILMS, INC.,

         Plaintiff,

     v

MADISON SQUARE GARDEN, L.P.,
MADISON SQUARE GARDEN CENTER, INC.,

         Defendants,

------------------------------------------------------------X

**COMPLAINT**

Index No. 06 CV 6451 (DC)

ECF Case

Plaintiff, by and through its attorneys, McLAUGHLIN & STERN, LLP, for its complaint, respectfully alleges as follows:

### NATURE OF THE ACTION

This is an action seeking declaratory and other relief on behalf of plaintiff ZIPPORAH FILMS, INC. for a declaration that defendants MADISON SQUARE GARDEN CENTER, INC. and MADISON SQUARE GARDEN, L.P unreasonably withheld approval of the documentary film entitled, *The Garden,* produced by plaintiff, and that plaintiff is entitled to publicly exhibit and distribute it pursuant to the terms of the agreement between the parties.

### JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §2201, in a case of actual controversy, and 28 U.S.C. §1332(a), there being diversity of citizenship between the parties. The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

2. Pursuant to 28 U.S.C. §1391(b), venue is proper in the Southern District of New York

Dockets.Justia.com

in that defendants have offices in the Southern District, and have performed acts in this District
which form the basis for the within claim for relief.

## THE PARTIES

3. Plaintiff ZIPPORAH FILMS, INC. ("Plaintiff" or "ZIPPORAH") is a corporation
organized and existing under the laws of the Commonwealth of Massachusetts and has its
principal offices at One Richdale Avenue, Unit #4, Cambridge, Massachusetts 02140.

4. ZIPPORAH is engaged in the business of the production and distribution of
documentary motion picture films by the sale, rental, leasing, and licensing of broadcasting rights
to documentary motion picture films throughout the United States of America. ZIPPORAH was
founded in 1971 by Frederick Wiseman, who has served as its General Manager since its
inception.

5. Mr. Wiseman is one of the most highly acclaimed producers of documentary motion
picture films in the world. During the past forty years he has produced more than thirty
documentary films, all produced in an artistic style in which actual events are filmed and
recorded as they occur, without any staging or rehearsal, and the events so recorded are edited
into a finished film without any narration or explanatory matter other than the actual events
displayed to the viewer.

6. The documentary films made by ZIPPORAH and Mr. Wiseman have been shown on
television throughout the United States through the stations of the Public Broadcasting System
("PBS"), on television worldwide, and at various film festivals. He has received numerous
prizes and awards for these films, has been awarded honorary degrees by leading educational
institutions for his film work, and in other ways has become recognized as a film maker of

2

distinction and unusual ability

7. Upon information and belief, defendant MADISON SQUARE GARDEN CENTER, INC. is a corporation organized and existing as an entity under the laws of the State of New York, having its principal office located at Two Pennsylvania Plaza, New York, New York 10121, and is a division of defendant MADISON SQUARE GARDEN, L.P. (Collectively "defendants" or "MSG").

8. Upon information and belief, defendant MADISON SQUARE GARDEN, L.P. is a limited partnership organized and existing as an entity under the laws of the State of Delaware, and is qualified to do business in the State of New York, having its New York office located at Four Pennsylvania Plaza, New York, New York 10121. Upon information and belief, no general or limited partner of MADISON SQUARE GARDEN, L.P. is a citizen of the Commonwealth of Massachusetts.

9. MSG operates a sports and entertainment complex located in New York City, which it proclaims to be "The World's Most Famous Arena", and in which are shown to the public such diverse forms of entertainment as professional basketball games, professional hockey games, the circus, animal shows and conventions, trade shows, and other events requiring large capacity for audiences. The complex is named "Madison Square Garden" and often is more simply called The Garden ("The Garden").

## FACTS COMMON TO ALL CAUSES OF ACTION

10. In 1997, Mr. Wiseman met with officers of MSG to request permission to make a documentary motion picture film, eventually entitled *The Garden* (the "Documentary") showing various aspects of operations of The Garden. After a period of negotiations, ZIPPORAH was

3

granted permission to film activities of The Garden, and on August 11, 1997, the parties entered into a five-page written agreement (the "Agreement") setting forth the terms and conditions upon which the plaintiff would be permitted to film activities at The Garden for the purpose of making a documentary motion picture film depicting the operations of The Garden. The Agreement was signed by Robert Russo, then Manager of MSG Facilities on behalf of MSG, and Mr. Wiseman on behalf of ZIPPORAH. A copy of the Agreement is attached hereto as Exhibit "A" and incorporated herein by reference.

11. The "Filming Procedure" set forth in the Agreement provides that "MSG shall be entitled to have a representative present at all times during the Filming. All camera placements shall be subject to MSG's approval (which shall not be unreasonably withheld). Producer agrees to comply with any request by MSG that cameras be turned off from time to time, and the specific meetings, activities, events and operations be excluded from the Filming and therefore the Documentary." Exhibit "A," ¶ 1(b) of the Agreement.

12. Paragraph 10(c) of the Agreement provides that ZIPPORAH would obtain the written approval of MSG before any public exhibition or distribution of the film, but that such written approval was *"not to be unreasonably withheld ... MSG shall not be entitled to withhold approval based solely on artistic or aesthetic matters."* Exhibit "A." (Emphasis added).

13. Further, MSG set forth additional written procedures and details regarding filming and production of the Documentary in two memoranda from senior officers of MSG, dated February 1998 and February 23, 1998. Copies of the memoranda are attached hereto as Exhibits "B" and "C" and incorporated herein by reference.

14. MSG "enthusiastically endorsed" the project, and requested that its employees afford

4

ZIPPORAH with "all assistance you can provide." Exhibit "B."

15. MSG stated that the "goal" of the Documentary was to "capture the inner workings of our Company." Exhibits "B" and "C."

16. The filming procedures set forth the understanding that "[i]f any individual feels that any activity or conversation should not be filmed for any reason, the crew will stop recording immediately. It is [Mr. Wiseman's] practice to ask permission to begin recording before doing so." Exhibit "C." Further, plaintiff was precluded from filming "on the 14th and 16th floors of 2 Penn without being escorted and without advance permission from a department or public relations liaison." Exhibit "C." Upon information and belief, MSG senior management occupy the 14th and 16th floors of 2 Penn.

17. In accordance with the filming procedures contained in the Agreement and the MSG memoranda, commencing in February 1998, and continuing until early April 1998, Mr. Wiseman, a cameraman, and an assistant filmed activities at The Garden on fifty eight consecutive days, producing approximately one hundred ten hours of film with accompanying sound track. MSG employees directed when and where the film crew could operate and assisted the film crew in obtaining permission to film specific activities from persons who were filmed. See Exhibits "A," "B," and "C."

18. During the following six years, Mr. Wiseman, assisted by other employees of ZIPPORAH, worked on the editing of the film about The Garden, reducing the original hours of film to the approximately three hours of film which are included in the finished Documentary.

19. The finished Documentary, entitled *"The Garden"*, is a work of high artistic merit. The use of images and names in the Documentary were for an artistic purpose and not for

5

advertising or trade purposes.

20. On or about November 2004, Mr. Wiseman, acting on behalf of ZIPPORAH, delivered a videotape of the completed Documentary to MSG for its review and written approval pursuant to the requirements of paragraph 10(c) of the Agreement. See Exhibit "A". Paragraph 10(c) of the Agreement provides that such written approval was "not to be unreasonably withheld." *Id*

21. A DVD of the finished Documentary, identical in content to the videotape delivered to MSG for its written approval, is attached to this complaint and marked as Exhibit "D".

22. ZIPPORAH sought MSG's written approval because the Documentary was scheduled to be aired on PBS in March 2005. The Sundance Film Festival, and two European film festivals also requested that Mr. Wiseman present the Documentary in early 2005.

23. MSG unreasonably refused to grant ZIPPORAH written approval to publicly exhibit and distribute the Documentary. In doing so, MSG did not act in good faith or reasonably as was required under the Agreement.

24. MSG purported to rely on issues of confidentiality and consent to block the release of the Documentary. They alleged certain scenes disclosed matters that were confidential and disparaging to MSG, and that plaintiff had failed to obtain the necessary consents of the third parties shown in the Documentary. These reasons are merely a pretext for not granting approval. MSG identified words and segments of scenes they deemed objectionable, and by doing so, were in effect withholding approval for artistic and aesthetic purposes which is not allowed under the Agreement. See Exhibit "A," ¶ 10(c).

25. Specifically, MSG objected to three scenes in the Documentary involving senior

6

management of MSG, to wit, (a) a staff meeting between Mr. Russo, the then president of MSG Facilities and several department heads at MSG, (b) a Legal Department staff meeting run by MSG's General Counsel, and (c) an Executive Committee meeting of MSG senior management, including the Chief Executive Officer and General Counsel.

26. Nothing in the three scenes, nor any other material in the Documentary, reveals anything that could as of 2004 or now be deemed to be of a confidential nature under an objective reasonable meaning of the term.

27. Further, the senior management participants had invited plaintiff into the meetings and were aware that plaintiff was filming them. At no time did these senior management participants ask plaintiff to cease filming or leave the room, as they had a right to do under paragraph 1(b) of the Agreement and MSG's filming procedures. See Exhibits "A," "B," and "C." To the contrary, they assisted plaintiff in the filming of these meetings. Following the filming, plaintiff affirmatively wrote letters thanking defendants' officers for their cooperation and for the opportunity to film their meetings, which were acknowledged without objection.

28. Next, MSG objected to a fourth scene taking place at the Mall entry of metal detector screenings. The security measures depicted in the scene are entirely unremarkable and are not confidential. The scene was observed by the public present in the Mall entry who were attending the event. As such the scene is not confidential under paragraph 8 of the Agreement, because it was "generally available to the public." Exhibit "A," ¶ 8(i). Further, MSG suggested in writing that plaintiff film this scene. A copy of the memorandum entitled "Upcoming Events and Ideas for PBS Documentary" from MSG Entertainment Publicity Group is annexed hereto as Exhibit "E" and incorporated herein by reference.

7

29. The Mall entry scene can not in any way be deemed as disparaging to MSG. The security measures depicted in the scene are quite routine in today's world, requiring people to pass through metal detectors and be subject to screening with a handheld metal detector.

30. Finally, MSG withheld its approval in bad faith in that it claimed that ZIPPORAH failed to obtain necessary third party consents under the Agreement, where the Agreement did not give MSG the right to object to the exhibition or distribution of the Documentary on this basis. See Exhibit "A," ¶ 10(c).

31. The Agreement merely provides that plaintiff "has or shall obtain any necessary consents that may be required by law," and that plaintiff shall not use any third party "without having obtained the necessary consent from such third party." Exhibit "A," ¶¶ 4 and 7.

32. Plaintiff obtained any necessary consents that were required by law at the time of filming. The Documentary does not violate the rights of privacy of any person shown therein.

33. MSG sent out letters in or about January 2005 to third parties shown in the Documentary. MSG acted in bad faith by indicating in the letters that the third party's consent was required, when that is not so under the law in New York. MSG further cast ZIPPORAH in a negative light, accusing it of failing to meet its obligations under the Agreement with regard to this issue.

34. Defendants created the consent issue with the intent to ensure that plaintiff could not obtain such consents. Upon information and belief, MSG told third parties not to give consent to ZIPPORAH and represented to third parties that they did not want the Documentary released. The third parties then stated to representatives of plaintiff that they would not give the consent to ZIPPORAH or take any action that was not approved by MSG.

8

35. Based on the allegations set forth above, plaintiff contends that MSG unreasonably withheld its written approval for the Documentary and has failed to act in good faith. More particularly:

(a)    No information is included in the Documentary which either in 2004 or at the present time, could be considered proprietary or confidential to MSG, under a reasonable or objective meaning of those terms.

(b)    The Documentary is not disparaging of The Garden or of any person shown in it and does not include any material which is false or misleading or which suggests any wrongdoing or misconduct by any employee of The Garden.

(c)    The Documentary does not violate the rights of privacy of any person shown in the film, and plaintiff obtained any necessary consents as required by law.

36. MSG's failure to grant approval and to act in good faith constitutes a breach of the Agreement. Plaintiff has adhered to all the terms of the Agreement and is not in breach thereof.

37. ZIPPORAH, pursuant to the Agreement and in reliance on it, has invested substantial amounts of time in the filming and production of the Documentary for purposes of exhibition and distribution. Plaintiff entered into agreements to exhibit and distribute the Documentary. As such, ZIPPORAH has incurred obligations for payments of monies in production of the Documentary and has lost opportunities to receive funds for exhibition and distribution of the film. The amount in controversy exceeds $75,000.

38. ZIPPORAH's reputation has been damaged by defendants' unreasonable withholding of approval to publicly exhibit and distribute the Documentary to PBS, Sundance Film festival and other film festivals. Plaintiff has also lost additional opportunities to exhibit and distribute

9

the Documentary.

39. An actual, justiciable controversy now exists between the parties concerning plaintiff's rights to publicly exhibit and distribute the Documentary and involving questions as to the meaning of the Agreement and whether defendants have unreasonably withheld written approval of the Documentary, which defendants contend they have not done.

40. The Court should exercise its discretion to grant declaratory relief in this action for at least the following reasons:

(a)    The issue to be decided by the Court is relatively simple and presents no complex or unusual issues of law, nor does it involve application of the laws of any foreign country.

(b)    The entry of a declaratory judgment will finally settle the controversy between the parties, declare the rights and duties of the parties under the Agreement, and enable the parties to be guided in their conduct with respect to the Documentary without incurring the uncertain risks of liability for substantial claims for money damages.

(c)    MSG has threatened to seek injunctive relief against ZIPPORAH if it engages in any public exhibition or distribution of the film before obtaining the written approval of MSG.

(d)    No better or more effective means of resolving the controversy exists

(e)    The film is a work of artistic merit which should be seen by members of the public.

41. ZIPPORAH has no adequate remedy at law because damages will not make up for the inability to publicly exhibit and distribute the Documentary.

10

WHEREFORE, plaintiff requests:

(1) The Court determine the rights and duties of the parties under the Agreement.

(2) The Court enter a declaratory judgment determining that:

(a)  defendants have unreasonably withheld written approval of the Documentary produced by plaintiff, entitled "*The Garden*";

(b)  plaintiff is entitled to publicly exhibit and distribute the Documentary pursuant to the terms of the Agreement between the parties.

(3) After the Court declares that defendants unreasonably withheld their approval, that the Court award plaintiff incidental damages for the harm done to ZIPPORAH's reputation and for the delay in exhibiting and distributing the Documentary

(4) The Court grant plaintiff its costs and disbursements in this action.

(5) The Court grant plaintiff such other and further relief as it may deem fit and proper in the circumstances.

Dated: New York, New York
      August 24, 2006

McLAUGHLIN & STERN, LLP

By_____
    Steven J. Nyman (SN 2097)
    Charles L. Mandelstam (CM 9267)
    Deanna R. Waldron (DW 2611)
    Attorneys for Plaintiff
    260 Madison Avenue
    New York, NY 10016
    (212) 448-1100

Exhibit A



August 11, 1997

Zipporah Films Inc.
One Richdale Avenue
Unit #4
Cambridge, Mass 02140
Attention: Mr. Frederick Wiseman

Gentlemen:

This will confirm our agreement regarding the grant by Madison Square Garden Center, a division of Madison Square Garden, L.P. ("MSG"), to Zipporah Films, Inc. ("Producer") of a limited license to conduct certain filming activities at the Madison Square Garden Sports and Entertainment Complex (the "Building"), upon the following terms and conditions:

1.    (a)  License.  MSG hereby grants to Producer the non-exclusive right and privilege to utilize certain areas of the Building and of the corporate offices of MSG at Two Penn Plaza (the "Offices") at mutually agreed upon times during approximately twelve weeks in February, March and April of 1998, solely for the purpose of filming or videotaping (the "Filming") a documentary film depicting the operations of Madison Square Garden (the "Documentary"), pursuant to the terms set forth herein.

(b)  Filming Procedure.  Producer represents that the Filming shall not interfere with or impede any of MSG's business operations.  MSG shall be entitled to have a representative present at all times during the Filming.  All camera placements shall be subject to MSG's approval (which shall not be unreasonably withheld).  Producer agrees to comply with any request by MSG that cameras be turned off from time to time, and that specific meetings, activities, events and operations be excluded from the Filming and the Documentary.  Producer acknowledges that it may also be required to obtain approval to film on the premises of the Offices from the owner and/or landlord of Two Penn Plaza.  MSG agrees to assist in obtaining such approval.

2.    Credentials and Equipment.  All arrangements for access credentials and where to enter the Building shall be made with MSG's Building Operations Department.  Producer hereby agrees that the camera and lights to be used in connection with the Filming shall be hand held, except for occasional use of a camera tripod for support.

Madison Square Garden
Two Pennsylvania Plaza
New York, NY 10121-0091
Tel 212.465.6000

3.   (a)  Limited License.  Producer agrees that any footage resulting from the Filming will be used solely for purposes of including it in the Documentary and in connection with the advertising, promotion and publicity of the Documentary.

(b)  Proprietary Rights.   MSG agrees that Producer shall own, in perpetuity, all copyrights and all other right, title and interest of every kind, in and to the Documentary, including: (i) the right to use solely in the Documentary and in connection with the advertising, promotion and publicity of the Documentary any footage of the Building resulting from the Filming (subject to MSG's approval rights pursuant to Paragraph 10 below); and (ii) the right to exhibit, perform and exploit the Documentary in all media now known or unknown throughout the universe in perpetuity, except as otherwise restricted or provided herein.

4.   Representations.  Producer represents and warrants to MSG that Producer has or shall obtain any necessary consent that may be required by law from any person whose name or likeness is utilized in the Documentary, which consent shall authorize Producer to use such name and likeness in such manner.  Producer shall not use the name, logo or proprietary materials of any third party that appear on or in the premises of the Building or at the Offices during the Filming, or otherwise (including, without limitation, any sponsorship signage, without having obtained any necessary consent from such third party.

5.   (a)  License Fee.  MSG agrees to waive its customary license fee for the Filming, and agrees that the license granted hereunder shall be a royalty-free license; provided, however, that Producer represents and warrants to MSG that the Documentary shall not be utilized for commercial purposes, except for exhibition on PBS or other programming networks or exhibition in motion picture theaters or distribution by sale or rental of prints or video cassettes for non-commercial use (i.e., to schools, libraries, etc. and not at 'video stores").

(b)  Expenses.  Producer further agrees to pay to MSG all costs and expenses incurred by it and arising out of the Filming, including, but not limited to, stage crews and electricians as are necessary for the production of the Filming (at MSG's standard rates), provided that MSG will use reasonable efforts to inform Producer of any such anticipated costs and expenses prior to the applicable portion of the Filming.   In addition, if by reason of MSG's collective bargaining agreement with any union, any personnel used during the Filming or any other union personnel are required to be paid additional sums due to the Filming, Producer will reimburse MSG such additional sums for such personnel.

6. _Union Rules_. In no event shall Producer, or any of its agents, employees or contractors take any action or fail to take any action which would or might interfere with or deleteriously affect any existing union jurisdictional arrangement relating to the Building, provided that MSG will use reasonable efforts to inform Producer of any such arrangement prior to the applicable portion of the Filming.

7. _Third Party Rights_. Producer represents and warrants to MSG that Producer's (or its successor's, licensee's or assign's) use of footage resulting from the Filming will not violate the right of privacy or other civil rights or constitute a defamation, libel or slander or otherwise interfere with the rights of any person, firm or corporation. Producer shall not use the name, logo or proprietary materials of any third party (including, without limitation, any portion of the performance of any musician, artist, athlete, actor or other person appearing in any event being presented at the Building) that appear during the Filming, or otherwise, without having obtained any necessary consent from such third party.

8. _Confidentiality_. The parties acknowledge that in connection with the Filming, and Producer's presence in and around the Building and Offices pursuant to this Agreement, Producer may be exposed to certain proprietary and confidential information relative to MSG's operations, finances or otherwise. For purposes of this Paragraph 8, the term "proprietary and confidential information" shall mean any information that is identified as such by MSG or any of its employees, but shall not include information that (i) was or becomes generally available to the public other than as a result to a disclosure by Producer (or its employees, or representatives); (ii) was available to Producer prior to its disclosure to Producer pursuant to this Agreement; or (iii) becomes available to Producer from a third party source on a non-confidential basis. Producer hereby agrees that it will not reveal, nor will any of its employees, agents, contractors or representatives reveal, to any person, firm, corporation or other entity any such proprietary or confidential information nor shall Producer or any of its employees, agents, contractors or representatives refer to, include or use in any way any such information in the Documentary (or in any other film or other project), unless and until Producer has obtained MSG's prior written consent.

9. (a) _Indemnity_. Producer hereby agrees to indemnify, defend and hold harmless MSG, Madison Square Garden, L.P., MSG Eden Corporation, ITT Corporation and Cablevision Systems Corporation, their affiliated entities and their respective officers, directors, employees and agents from and against any and all liabilities, losses, damages, judgments, settlement expenses, claims, costs and expenses whatsoever (including, without limitation, court costs, reasonable attorneys' fees and related disbursements, whether incurred in an action between any such indemnitee and Producer, or between any such indemnitee and

any third party, or otherwise) arising out of or in connection with: (i) the act or omission of Producer, its affiliates or any of their respective officers, directors, employees, agents, contractors, successors, licensees or assigns participating in, appearing in or assisting Producer with the Filming or the Documentary or involved in promoting, advertising, distributing or otherwise exploiting the Documentary; or (ii) the breach by Producer of any of Producer's agreements, covenants, representations or warranties under this Agreement.

(b) **Insurance.** Producer shall obtain and maintain at all times during the Filming a commercial general liability policy (with contractual liability coverage) covering MSG and its affiliates for bodily injury (including death), with limitations of liability of at least $2,000,000 per occurrence. Producer shall deliver to MSG prior to January 15, 1998 a certificate evidencing such coverage, in form satisfactory to MSG, and reflecting that the following entities have been added as additional insured on the policy: Madison Square Garden Center, Madison Square Garden, L.P., MSG Eden Corporation, ITT Corporation, Cablevision Systems Corporation, Vornado Two Penn Plaza L.L.C., Mendik Realty Company and their affiliates.

10. (a) **Trademarks.** It is hereby acknowledged and understood that, other than as provided for in Paragraph 10(b) below or otherwise herein, no right, title or interest in or to the use of any name, likeness, trademark, service mark, logo or other identifying mark of Madison Square Garden or any affiliated entity thereof (the "Trademarks") is granted to Producer hereunder. All such right, title and interest in and to any of the Trademarks shall remain the sole and exclusive property of Madison Square Garden or such affiliate, as the case may be.

(b) **Use of Trademarks.** Producer agrees that neither it nor its successors, licensees or assignees shall use any of the Trademarks in any manner which does or might bring Madison Square Garden, L.P. or any of its affiliates or divisions into disrepute or reflect negatively on them or which does or might adversely affect the validity of any such Trademark. Producer recognizes the great value of the goodwill associated with the Trademarks, and acknowledges that they have acquired secondary meaning in the minds of the public. Producer shall utilize such licensed Trademarks with a high standard of style, appearance and quality so as to protect them and the goodwill associated therewith. Producer shall use the licensed Trademarks solely for the purpose contemplated hereunder, and shall not knowingly permit others to utilize the Trademarks for any purpose without MSG's prior written approval in each instance. Producer may utilize the name "Madison Square Garden" or the name "The Garden" as the title of the Documentary.

(c) **Approvals**. Solely for purposes of ensuring compliance with the confidentiality restrictions in Paragraph 8 above and the covenants contained in Paragraph 10(b) and elsewhere in this Agreement, Producer agrees that it shall deliver to MSG a 3/4" videotape of the Documentary for MSG's review and written approval (not to be unreasonably withheld) prior to any PBS or other public exhibition or distribution of the Documentary. MSG shall not be entitled to withhold approval based solely upon artistic or aesthetic matters. MSG shall, at no charge, be entitled to utilize such videotape on or about the premises of the Building, including, without limitation, for purposes of promoting the licensing of the Building to third parties for other film, advertising or related projects, displaying on its Gardenvision Videoscreen or Box Office video monitors or using excerpts of the Documentary during MSG training sessions for employees or during the MSG Tour. Subject to MSG's rights hereunder, Producer shall have all customary editorial control of the Documentary.

11. **Credit**. MSG shall receive a credit on screen in the end titles of the Documentary in substantially the form "Special Thanks to Madison Square Garden."

12. **Miscellaneous**. This letter agreement shall be governed by and construed in accordance with the internal laws of the State of New York, and may not be assigned, directly or indirectly, by either party without the prior written consent of the other party. This letter agreement constitutes the entire agreement between the parties and supersedes any and all prior agreements, oral or written, with respect to the subject matter hereof. No change or amendment of this letter agreement shall be valid unless it is in writing and signed by both parties hereto.

If the foregoing is acceptable to you, please sign where indicated below whereupon the terms hereof shall constitute a binding agreement between us.

Very truly yours,

MADISON SQUARE GARDEN CENTER, a division of Madison Square Garden, L.P.

BY: Robert Russo

ACCEPTED AND AGREED:

ZIPPORAH FILMS, INC.

By: Frederick Wiseman

ZIPPORAH/LETTERS/LICENSE                                    5

Exhibit B

"B"

**BARRY WATKINS**
Senior Vice President Communications



February, 1998

To All Concerned:

This letter will serve to introduce Fred Wiseman and crew of Zipporah Films who are filming a documentary about Madison Square Garden to be broadcast on PBS.

Fred is an award-winning film maker whose documentaries have aired on PBS and have been seen worldwide over the years. His goal is to capture the inner workings of our Company with access to the people, events and behind-the-scenes activities that make the Garden "The World's Most Famous Arena."

The project, which will continue into early April, is enthusiastically endorsed by the Garden and we would very much appreciate any and all assistance that you can provide. A Garden public relations representative will be supervising the crew at every event during which filming is taking place.

Thank you in advance for your cooperation and participation with this important endeavor.

Cordially,

cc: David Checketts, President and CEO
Robert Russo, Executive Vice President and General Manager

Madison Square Garden
Two Pennsylvania Plaza
New York, NY 10121-0091
Tel 212.465.5920
Fax 212.465.4423

Exhibit C

"C"

# MADISON SQUARE GARDEN
### ITT/Cablevision

| | | | |
|---|---|---|---|
| To: | Distribution | Date: | 2/23/98 |
| From: | Bobby Goldwater/Barry Watkins | Phone: | 6220 |
| Subject: | Garden Documentary Project | Copies: | D. Checketts<br>Executive Committee |

As a followup to a meeting today, this memo will confirm procedures and details regarding the production of a documentary film about Madison Square Garden.

Fred Wiseman, an award-winning film maker from Zipporah Films, and his crew of two have embarked on an eight-to-10-week project capturing the inner workings of our Company for a documentary with the working title, "The Garden," to be broadcast on PBS. The crew is self-contained and will require no additional lighting, power, equipment or labor for its work.

Fred's key need is access: to people, meetings, events and behind-the-scenes activities which might be taken for granted by most people but would provide Fred with the depth and texture he is seeking for the film. Based on our meeting, the following items were discussed:

1. All public relations departments will develop a list of recommended topics for Fred's information and consideration by this Friday, February 27. We will review these lists with Fred.
2. Fred and crew will be issued appropriate credentials for every event they will be filming. Each department's public relations liaison will provide instructions on the proper procedures and restrictions, if any, for each event/activity and will contact an event's promoter/executive/organization about the project to receive the necessary advance permission for filming and usage. Please note that Fred and crew have been issued general, temporary Garden ID cards.
3. Fred stated that if any individual feels that an activity or conversation should not be filmed for any reason, the crew will stop recording immediately. It is his practice to ask permission to begin recording before doing so.
4. While it has been agreed that the crew need not be escorted at all times, each public relations department will be responsible for determining when and if the crew should be escorted during its respective events/activities.
5. Fred and crew may not film on the 14th and 16th floors of 2 Penn without being escorted and without advance permission from a department or public relations liaison.
6. The project will be a topic of information at all production meetings for events through early April.

If there are any questions or suggestions regarding the project, please let us know. Thanks to everyone for your enthusiasm and participation.

Exhibit D

Hard copies of Exhibit D, two DVD disks,
are in the custody of the Clerk of the Court.

Exhibit E

**Upcoming Events & Ideas for PBS Documentary
Entertainment Publicity Group**

**Entertainment Shows**

February 28 – March 1:
International Cat Show (Expo Center, 10:00 a.m. – 6:00 p.m.)
- Press previews Tues., Feb. 24 at 11:00 a.m. (6th Fl. press room)
- live remote with WNBC on Friday, Feb. 27, 6:00 – 7:00 a.m. (Expo Center)
- live remote with WNYW on Saturday, Feb. 28 at 11:00 a.m. (Expo Center)
- It might be interesting to shoot another crew, (pending their approval) shooting an event here.

Now through March 14th – Wizard of Oz is rehearsing in Manhattan, but not at Garden. It may be possible to film some of the rehearsals. Also, there may be some fun behind the scenes stuff with hair & makeup people, prop people etc.

March 4 – Wizard of Oz meet and greet at rehearsal studio – 10:30am – Garden VP Tim Hawkins will introduce Garden employees to actors from show.

March 7:
Krutoi & Allegrova Russian Concert (Theater, 8:00 p.m.)

March 8:
OHEL Jewish Concert (Theater, 7:30 p.m.)
-- shoot crowd entering the Theater – to show diversity of events at MSG

March 10:
Job Fair (Expo Center, 12:00 p.m.) – Dylan Wanagiel (465-6776) is the contact

March 12:
Puff Daddy & The Family Concert (Arena, 7:00 p.m.)
-- Again, shooting the entrance might be interesting

March 14:
Discover Stars on Ice Figure Skating (Arena, 8:00 p.m.)
-- special ceremony honoring Scott Hamilton, induction into Garden Walk of Fame at the end of the show. This would be great to capture on film.

-more-

-4-

Lynton Harris – Madison "Scare" Garden creator – Follow him as he meets with
    potential vendors shopping their horrific wears for Halloween.
Dave Snowden – MSG's manager for Disabled Services – Follow him rolling
    around the arena, checking on handicapped seating during events.
Telephone operators as they answer questions about the Garden


Please contact the following people before shooting any events listed above, as
some of them must gain approval from a host of different people.

Dan Schoenberg – Entertainment & Athletics – 465-6367
Eric Gelfand – Athletics – 465-6659
Beth Hergenhan – Entertainment shows – 465-6360
Cathy Del Priore – Anything pertaining to The Wizard of Oz – 465-6771