UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ZIPPORAH FILMS, INC.,

          PLAINTIFF,

-AGAINST-

MADISON SQUARE GARDEN, L.P.,
MADISON SQUARE GARDEN CENTER, INC.,

          DEFENDANTS.

CASE NO. 06 CV 6451 (DC)

**ELECTRONICALLY FILED**

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO SEAL EXHIBIT D TO THE COMPLAINT

## I. INTRODUCTION

The issue of the public disclosure of Exhibit D to the Complaint is at the core of this case. Defendant Madison Square Garden, L.P. ("MSG") and Plaintiff Zipporah Films, Inc. ("Zipporah") entered into an agreement on August 11, 1997 (the "Agreement"), which described the parties' rights and duties pertaining to the filming, exhibition and distribution of Zipporah's purported documentary (the "Film"). In exchange for permission to film certain activities at Madison Square Garden for use in the Film, Zipporah and its General Manager, Frederick Wiseman, relinquished any right of unfettered public disclosure. Regardless, Mr. Wiseman and Zipporah rejected MSG's request to make minor edits to remove confidential information from the Film and failed to obtain the necessary consent of various third parties shown in the Film. Zipporah instead brought this lawsuit in an effort to exhibit and distribute the Film "as is." By its opposition to MSG's motion to seal Exhibit D (a DVD copy of the Film), Zipporah now seeks to dodge its clear contractual obligations before this Court even addresses the merits of the dispute.

If the Court's temporary seal is lifted, any member of the public could remove Exhibit D from the publicly available court file, cause a copy to be made therefrom, or, in perhaps the most damaging scenario, disseminate the film widely via the Internet or otherwise. Any such event would irreparably reduce the benefit to MSG of its negotiated rights under the 1997 Agreement. As set forth below, public disclosure of the Film will cause irreparable harm to MSG's reputation and its relationships with employees and clients. On the other hand, there is no compelling argument against sealing the Film. If Zipporah is successful on the merits, the public will likely have access to the film within one year. There is no apparent public benefit to viewing the Film before that time, as the footage in question is already nearly nine years old. Indeed, any presumed right of public access to the Film is easily outweighed by the potential harm to MSG from the damage to its relationships with third parties and the disclosure of its confidential and sensitive business information. Accordingly, the Court should permanently seal Exhibit D to the Complaint.[1]

## II.   FACTUAL BACKGROUND

In Spring 1997, Frederick Wiseman contacted MSG to propose a documentary film about daily activities at Madison Square Garden. Decl. of Robert A. Brandon at ¶ 3. Mr. Wiseman indicated that it would take one year to edit the Film, which would result in a timeless portrait of "The Garden" as a major institution in the life of America. *Id.* MSG agreed to grant Mr. Wiseman and the Zipporah film crew access to operations at Madison Square Garden, subject to certain conditions. *Id.* at ¶ 4. Those conditions were personally negotiated by Mr. Wiseman, who, aside from being a prolific documentary filmmaker, is a graduate of Yale Law School and a former law professor. *Id.* First, Mr. Wiseman agreed not to reveal any information that MSG deemed proprietary or confidential. *See* Complaint, Exhibit A, at ¶ 8. Second, Mr. Wiseman agreed to obtain any necessary consent from any third party before including third parties in the Film. *Id.* at ¶¶ 4, 7. To ensure that these conditions were met, the Agreement required Mr.

---

[1] The Court can always lift the seal if Zipporah is successful on the merits.

Wiseman to allow MSG to review and approve the Film before he revealed it to anyone. *Id.* at ¶ 10(c).

Armed with the knowledge that it would maintain a well-defined measure of editorial control over the Film, MSG gave Mr. Wiseman carte blanche to record all manner of executive meetings, concerts, family shows, and sporting events in 1998. Decl. of Robert A. Brandon at ¶ 6. During filming, the MSG senior official who acted as Mr. Wiseman's primary liaison with MSG during the shooting of the Film took pains to remind Mr. Wiseman of his obligation to obtain the written consent of third parties before including them in the Film. *Id.* at ¶ 7. Mr. Wiseman concluded filming in April 1998 and made no contact with MSG for the next six years. *Id.* at ¶¶ 8, 9. MSG was left to assume he had abandoned the project. *Id.* at ¶ 9.

In November 2004, Mr. Wiseman reemerged to seek MSG's approval of the completed Film. *Id.* at ¶ 10. MSG promptly identified four scenes in the three-hour seventeen minute Film that contained proprietary information. *Id.* Specifically, several scenes depicted MSG executives discussing confidential strategies employed in labor negotiations and highly sensitive communications with union employees. *Id.* MSG also requested proof that Zipporah had obtained the necessary third party consents. *Id.* at ¶ 11. At the request of Zipporah's counsel, MSG prepared a list of third parties from whom consent might be necessary and advised those third parties that Zipporah wished to resolve any outstanding consent issues directly.[2] To further facilitate the process, MSG forwarded copies of the Film to the third parties, on Zipporah's behalf, solely to determine if those third parties would consent to their likenesses or proprietary events appearing in the Film. *Id.* at ¶ 13. Ultimately, Zipporah failed to provide MSG with any evidence that it had obtained the necessary third party consents and refused to engage MSG in any discussion about possible edits to the Film. *Id.* at ¶ 14.

---

[2] MSG's list of third parties from whom Zipporah should seek consent was based, in no small part, on the existence of standard venue license agreements between MSG and its various clients. These agreements created a legal obligation on the part of MSG and, by extension, Zipporah to obtain the prior written consent of various third parties before exploiting them or their performances through, *inter alia*, film. *Id.* at ¶ 12.

3

### III. EXHIBIT D SHOULD REMAIN UNDER SEAL

If a document is relevant to the judicial process, courts must balance the weight of a presumption of access to the document against countervailing factors in determining whether the document should remain under seal. *U.S. v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995) (*Amodeo II*). Here, any presumption of access to Exhibit D is eclipsed by both MSG's interest in protecting highly sensitive proprietary information and Zipporah's contractual obligations.

- **Exhibit D is Not Relevant to the Judicial Process**

As an initial matter, the mere filing of a copy of the Film as an exhibit to the Complaint is insufficient to render it a judicial document subject to the right of public access. *U.S. v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995) (*Amodeo I*). The general right to inspect and copy judicial records and documents is based on the need for federal courts "to have some measure of accountability and for the public to have confidence in the administration of justice." *Amodeo II*, 71 F.3d at 1048. If a document is not useful in the judicial process, the concern about judicial accountability is not implicated. *Amodeo I*, 44 F.3d at 145. In this case, the parties' rights are governed by the Agreement, and the Court may adjudicate this dispute without ever viewing the Film.

- **MSG's Privacy Interests Outweigh Any Presumption of Access**

Even if the Film is considered a judicial document, the right of public access is not absolute. In certain instances, "courts must deny access to judicial documents-generally where open inspection may be used as a vehicle for improper purposes." *In Re Orion Pictures Corp.*, 21 F.3d 24, 27 (2d Cir. 1994) (internal citations omitted). Courts also consider whether the need of those opposing public disclosure to protect confidential information is sufficient to overcome the presumption of access. *See, e.g., Liberty Re (Bermuda) Ltd. v. TransAmerica Occidental Life Insurance Co.*, 2005 WL 1216292 (S.D.N.Y. 2005) (sealing record where proprietary interests of the parties outweighed minimal need for public access).

Here, permitting the open inspection and copying of Exhibit D could lead to the improper exhibition and distribution of the Film, an outcome that would deprive both MSG of its

negotiated rights under the Agreement and MSG's third party clients of their proprietary rights. To date, MSG has only distributed copies of the Film to third parties who appear in the Film, for the sole purpose of assisting Zipporah in its failed effort to obtain the necessary consent of those third parties. The widespread dissemination of the Film would amount to something far different, as it would jeopardize MSG's relationships with the very third parties who refused to consent to appear in the Film. Brandon Decl. at ¶ 15. Moreover, the privacy interests of those innocent third parties constitute a "venerable common law exception to the presumption of access." *Roberts v. Lederman*, 2004 WL 2238564 at *7 (E.D.N.Y. 2004) (internal citations omitted).

In addition to the potential harm to its relationship with its clients, MSG's need to protect proprietary information militates against lifting the seal on Exhibit D. The Film, as currently constituted, contains segments that reveal confidential labor relations strategies and other sensitive, executive-level discussions, which, if disclosed, could harm MSG's relationships with employees and undermine MSG's future business negotiations. Brandon Decl. at ¶ 15; *See Encyclopedia Brown Productions, Ltd. v. Home Box Office, Inc.*, 26 F. Supp. 2d 606, 614 (S.D.N.Y. 1998) (sealing decade-old confidential business information to prevent insight into company's current business practice). By contrast, there is no urgency to disclose Exhibit D to the public. The Film represents a "snapshot" of life at Madison Square Garden in 1998. It was never intended to be timely. On the contrary, the fact that Mr. Wiseman took six years to edit the Film shows that there would be no overriding benefit from immediate public disclosure.

## IV. CONCLUSION

For the foregoing reasons, MSG respectfully requests that its Motion to Seal Exhibit D to the Complaint be granted.

Dated: January 12, 2007
New York, New York

Respectfully submitted,

QUINN EMANUEL URQUHART
OLIVER & HEDGES LLP

s/ Robert L. Raskopf
Robert L. Raskopf (RR 5022)
Jonathan D. Marcus (JM 1885)
51 Madison Avenue, 22nd Floor
New York, New York 10010
212.849.7000

**ATTORNEYS FOR DEFENDANT
MADISON SQUARE GARDEN, L.P.**