UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ZIPPORAH FILMS, INC.,

            PLAINTIFF,

-AGAINST-

MADISON SQUARE GARDEN, L.P.,
MADISON SQUARE GARDEN CENTER, INC.,

            DEFENDANTS.

CASE NO. 06 CV 6451 (DC)

**ELECTRONICALLY FILED**

## DECLARATION OF ROBERT A. BRANDON IN SUPPORT OF DEFENDANT'S MOTION TO SEAL EXHIBIT D TO THE COMPLAINT

Robert A. Brandon declares:

1. I have served as Madison Square Garden L.P.'s ("MSG") Senior Vice President of Legal & Business Affairs since 1998. I regularly negotiate license agreements that allow individuals or entities to film or otherwise record events at Madison Square Garden and venue license agreements that contain restrictions on filming. I personally negotiated the August 11, 1997 agreement (the "Agreement," attached as Exhibit 1 hereto) between MSG and Zipporah Films, Inc. ("Zipporah"). I have worked in MSG's legal department since 1988, when I left the law firm of Proskauer Rose LLP, where I worked as a corporate associate beginning in 1984. Until my promotion to Senior Vice President at MSG, I held the positions of Associate Vice President of Legal & Business Affairs and Vice President of Legal & Business Affairs.

2. I make this declaration in support of Defendant's Motion to Seal Exhibit D to the Complaint. I have personal knowledge of the facts set forth herein.

3. In the spring of 1997, Zipporah General Manager Frederick Wiseman, a prolific documentary filmmaker, contacted MSG with a proposal for a film about Madison Square Garden (the "Film"). Mr. Wiseman suggested that he would chronicle daily activities at "The Garden" in order to produce a portrait of the place as a major institution in the life of America.

4. MSG agreed to allow Mr. Wiseman and the Zipporah film crew to document activities at Madison Square Garden, subject to the carefully negotiated conditions set forth in the Agreement. Mr. Wiseman, a Yale Law School graduate and former law professor, personally negotiated the terms of the Agreement on Zipporah's behalf.

5. MSG was concerned that Zipporah's virtually unrestrained access to activities at Madison Square Garden would result in the filming of confidential MSG management discussions or events presented at the venue that could not be exploited without the consent of third parties with whom MSG had business relationships and contracts. Accordingly, MSG negotiated terms that required Zipporah to refrain from revealing any information that MSG deemed confidential and proprietary, and to obtain any necessary consent from third parties before including them in the Film. The Agreement also required Zipporah to obtain MSG's approval before exhibiting or distributing the Film to third parties.

6. MSG went to great lengths to accommodate Mr. Wiseman and the Zipporah film crew during February, March and April of 1998, granting access to and assistance at a wide variety of executive meetings, concerts, family shows, and sporting events. MSG provided this unprecedented access specifically because its interests were protected by the covenants in the Agreement.

7. During the course of filming, the MSG senior official who acted as Mr. Wiseman's primary liaison with MSG during the shooting of the Film reminded Mr. Wiseman of

his contractual obligation to obtain the written consent of third parties before including their likenesses or performances in the Film.

8. Mr. Wiseman and Zipporah concluded filming in April 1998.

9. Mr. Wiseman made no contact with MSG for the next six years, leaving MSG to assume that Zipporah had abandoned the Film.

10. Mr. Wiseman finally contacted MSG in November 2004 to seek approval of the completed Film. Although surprised that Mr. Wiseman had reemerged after such a long period of silence, MSG promptly reviewed the Film and identified four scenes in the three-hour and seventeen minute movie that contained MSG's proprietary and confidential information. Several of these scenes depicted MSG executives discussing confidential negotiating strategies and highly sensitive communications with union employees. Recognizing that the public disclosure of this information would potentially cause significant harm to MSG's business interests and its relationships with employees, MSG requested that Zipporah edit the scenes.

11. As another condition of its approval, MSG requested proof that Zipporah had obtained any necessary third party consents, pursuant to the Agreement. Subsequently, Zipporah requested that MSG assist in an effort to obtain the consent of various third parties. As it had done since the inception of its relationship with Zipporah, MSG agreed to provide assistance to facilitate the completion of the Film. To that end, MSG then prepared a list of third parties and contacted those third parties to explain that Zipporah sought their consent to include them in the Film.

12. MSG recognized the need to obtain consent from various third parties, in no small part, because of the existence of standard venue license agreements between MSG and the third parties. These agreements required MSG and, by extension, Zipporah, to obtain prior written

consent before exploiting the likenesses or proprietary events of third parties at Madison Square Garden through any electronic media, including film.

13. To further facilitate the process, MSG forwarded copies of the Film to the third parties included in the Film. This was also done at Zipporah's request, and on its behalf, solely to determine if the various third parties would consent to the inclusion of their likenesses or proprietary events in the Film.

14. Ultimately, Zipporah failed to provide MSG with any evidence that it had obtained any necessary consent from third parties whose likenesses or proprietary events were included in the Film. Zipporah also refused to engage MSG in any meaningful discussion about possible edits to the Film.

15. The exhibition or distribution of the Film "as is" and without the consent of the relevant third parties would result in irreparable harm to MSG. Several scenes in the Film contain discussions of highly sensitive and confidential business issues, which, if revealed, would damage MSG's relationship with its employees and undermine MSG's future negotiations with employees. These sensitive discussions took place in executive meetings, which MSG allowed Zipporah to access under the express condition that such confidential and proprietary information would not be included in the Film. MSG permitted these meetings to be filmed because it knew it had the contractual right to delete footage of any such confidential and proprietary material. Similarly, MSG has longstanding and significant business relationships with the third parties whose likenesses or proprietary events are included in the Film. Celebrities appearing at Madison Square Garden, and entertainment producers presenting events at the venue, do so with the explicit contractual understanding that MSG will protect their privacy and publicity interests, as well as their copyright, trademark and other proprietary interests in their

own entertainment product. The exploitation of these third parties or their proprietary events in the Film without the requisite prior written consent will cause inestimable damage to MSG's reputation among clients and could lead either to additional litigation against MSG or to those third parties refusing to do business with MSG in the future.

16. I declare under the penalty of perjury under the laws of the United States of America that the forgoing is true and correct to the best of my knowledge, information and belief. Executed on January 10, 2007, at New York, New York.

_____
Robert A. Brandon

# EXHIBIT 1

**MADISON SQUARE GARDEN**
*ITT/Cablevision*

August 11, 1997

Zipporah Films Inc.
One Richdale Avenue
Unit #4
Cambridge, Mass 02140
Attention: Mr. Frederick Wiseman

Gentlemen:

This will confirm our agreement regarding the grant by Madison Square Garden Center, a division of Madison Square Garden, L.P. ("MSG"), to Zipporah Films, Inc. ("Producer") of a limited license to conduct certain filming activities at the Madison Square Garden Sports and Entertainment Complex (the "Building"), upon the following terms and conditions:

1.  (a) _License_. MSG hereby grants to Producer the non-exclusive right and privilege to utilize certain areas of the Building and of the corporate offices of MSG at Two Penn Plaza (the "Offices") at mutually agreed upon times during approximately twelve weeks in February, March and April of 1998, solely for the purpose of filming or videotaping (the "Filming") a documentary film depicting the operations of Madison Square Garden (the "Documentary"), pursuant to the terms set forth herein.

    (b) _Filming Procedure_. Producer represents that the Filming shall not interfere with or impede any of MSG's business operations. MSG shall be entitled to have a representative present at all times during the Filming. All camera placements shall be subject to MSG's approval (which shall not be unreasonably withheld). Producer agrees to comply with any request by MSG that cameras be turned off from time to time, and that specific meetings, activities, events and operations be excluded from the Filming and the Documentary. Producer acknowledges that it may also be required to obtain approval to film on the premises of the Offices from the owner and/or landlord of Two Penn Plaza. MSG agrees to assist in obtaining such approval.

2.  _Credentials and Equipment_. All arrangements for access credentials and where to enter the Building shall be made with MSG's Building Operations Department. Producer hereby agrees that the camera and lights to be used in connection with the Filming shall be hand held, except for occasional use of a camera tripod for support.

Madison Square Garden
Two Pennsylvania Plaza
New York, NY 10121-0091
Tel 212.465.6000

3. (a) **Limited License**. Producer agrees that any footage resulting from the Filming will be used solely for purposes of including it in the Documentary and in connection with the advertising, promotion and publicity of the Documentary.

(b) **Proprietary Rights**. MSG agrees that Producer shall own, in perpetuity, all copyrights and all other right, title and interest of every kind, in and to the Documentary, including: (i) the right to use solely in the Documentary and in connection with the advertising, promotion and publicity of the Documentary any footage of the Building resulting from the Filming (subject to MSG's approval rights pursuant to Paragraph 10 below); and (ii) the right to exhibit, perform and exploit the Documentary in all media now known or unknown throughout the universe in perpetuity, except as otherwise restricted or provided herein.

4. **Representations**. Producer represents and warrants to MSG that Producer has or shall obtain any necessary consent that may be required by law from any person whose name or likeness is utilized in the Documentary, which consent shall authorize Producer to use such name and likeness in such manner. Producer shall not use the name, logo or proprietary materials of any third party that appear on or in the premises of the Building or at the Offices during the Filming, or otherwise (including, without limitation, any sponsorship signage, without having obtained any necessary consent from such third party.

5. (a) **License Fee**. MSG agrees to waive its customary license fee for the Filming, and agrees that the license granted hereunder shall be a royalty-free license; provided, however, that Producer represents and warrants to MSG that the Documentary shall not be utilized for commercial purposes, except for exhibition on PBS or other programming networks or exhibition in motion picture theaters or distribution by sale or rental of prints or video cassettes for non-commercial use (i.e., to schools, libraries, etc. and not at 'video stores").

(b) **Expenses**. Producer further agrees to pay to MSG all costs and expenses incurred by it and arising out of the Filming, including, but not limited to, stage crews and electricians as are necessary for the production of the Filming (at MSG's standard rates), provided that MSG will use reasonable efforts to inform Producer of any such anticipated costs and expenses prior to the applicable portion of the Filming. In addition, if by reason of MSG's collective bargaining agreement with any union, any personnel used during the Filming or any other union personnel are required to be paid additional sums due to the Filming, Producer will reimburse MSG such additional sums for such personnel.

6. <u>Union Rules</u>. In no event shall Producer, or any of its agents, employees or contractors take any action or fail to take any action which would or might interfere with or deleteriously affect any existing union jurisdictional arrangement relating to the Building, provided that MSG will use reasonable efforts to inform Producer of any such arrangement prior to the applicable portion of the Filming.

7. <u>Third Party Rights</u>. Producer represents and warrants to MSG that Producer's (or its successor's, licensee's or assign's) use of footage resulting from the Filming will not violate the right of privacy or other civil rights or constitute a defamation, libel or slander or otherwise interfere with the rights of any person, firm or corporation. Producer shall not use the name, logo or proprietary materials of any third party (including, without limitation, any portion of the performance of any musician, artist, athlete, actor or other person appearing in any event being presented at the Building) that appear during the Filming, or otherwise, without having obtained any necessary consent from such third party.

8. <u>Confidentiality</u>. The parties acknowledge that in connection with the Filming, and Producer's presence in and around the Building and Offices pursuant to this Agreement, Producer may be exposed to certain proprietary and confidential information relative to MSG's operations, finances or otherwise. For purposes of this Paragraph 8, the term "proprietary and confidential information" shall mean any information that is identified as such by MSG or any of its employees, but shall not include information that (i) was or becomes generally available to the public other than as a result to a disclosure by Producer (or its employees, or representatives); (ii) was available to Producer prior to its disclosure to Producer pursuant to this Agreement; or (iii) becomes available to Producer from a third party source on a non-confidential basis. Producer hereby agrees that it will not reveal, nor will any of its employees, agents, contractors or representatives reveal, to any person, firm, corporation or other entity any such proprietary or confidential information nor shall Producer or any of its employees, agents, contractors or representatives refer to, include or use in any way any such information in the Documentary (or in any other film or other project), unless and until Producer has obtained MSG's prior written consent.

9. (a) <u>Indemnity</u>. Producer hereby agrees to indemnify, defend and hold harmless MSG, Madison Square Garden, L.P., MSG Eden Corporation, ITT Corporation and Cablevision Systems Corporation, their affiliated entities and their respective officers, directors, employees and agents from and against any and all liabilities, losses, damages, judgments, settlement expenses, claims, costs and expenses whatsoever (including, without limitation, court costs, reasonable attorneys' fees and related disbursements, whether incurred in an action between any such indemnitee and Producer, or between any such indemnitee and

any third party, or otherwise) arising out of or in connection with: (i) the act or omission of Producer, its affiliates or any of their respective officers, directors, employees, agents, contractors, successors, licensees or assigns participating in, appearing in or assisting Producer with the Filming or the Documentary or involved in promoting, advertising, distributing or otherwise exploiting the Documentary; or (ii) the breach by Producer of any of Producer's agreements, covenants, representations or warranties under this Agreement.

(b) **Insurance**. Producer shall obtain and maintain at all times during the Filming a commercial general liability policy (with contractual liability coverage) covering MSG and its affiliates for bodily injury (including death), with limitations of liability of at least $2,000,000 per occurrence. Producer shall deliver to MSG prior to January 15, 1998 a certificate evidencing such coverage, in form satisfactory to MSG, and reflecting that the following entities have been added as additional insured on the policy: Madison Square Garden Center, Madison Square Garden, L.P., MSG Eden Corporation, ITT Corporation, Cablevision Systems Corporation, Vornado Two Penn Plaza L.L.C., Mendik Realty Company and their affiliates.

10. (a) **Trademarks**. It is hereby acknowledged and understood that, other than as provided for in Paragraph 10(b) below or otherwise herein, no right, title or interest in or to the use of any name, likeness, trademark, service mark, logo or other identifying mark of Madison Square Garden or any affiliated entity thereof (the "Trademarks") is granted to Producer hereunder. All such right, title and interest in and to any of the Trademarks shall remain the sole and exclusive property of Madison Square Garden or such affiliate, as the case may be.

(b) **Use of Trademarks**. Producer agrees that neither it nor its successors, licensees or assignees shall use any of the Trademarks in any manner which does or might bring Madison Square Garden, L.P. or any of its affiliates or divisions into disrepute or reflect negatively on them or which does or might adversely affect the validity of any such Trademark. Producer recognizes the great value of the goodwill associated with the Trademarks, and acknowledges that they have acquired secondary meaning in the minds of the public. Producer shall utilize such licensed Trademarks with a high standard of style, appearance and quality so as to protect them and the goodwill associated therewith. Producer shall use the licensed Trademarks solely for the purpose contemplated hereunder, and shall not knowingly permit others to utilize the Trademarks for any purpose without MSG's prior written approval in each instance. Producer may utilize the name "Madison Square Garden" or the name "The Garden" as the title of the Documentary.

(c) <u>Approvals</u>. Solely for purposes of ensuring compliance with the confidentiality restrictions in Paragraph 8 above and the covenants contained in Paragraph 10(b) and elsewhere in this Agreement, Producer agrees that it shall deliver to MSG a 3/4" videotape of the Documentary for MSG's review and written approval (not to be unreasonably withheld) prior to any PBS or other public exhibition or distribution of the Documentary. MSG shall not be entitled to withhold approval based solely upon artistic or aesthetic matters. MSG shall, at no charge, be entitled to utilize such videotape on or about the premises of the Building, including, without limitation, for purposes of promoting the licensing of the Building to third parties for other film, advertising or related projects, displaying on its Gardenvision Videoscreen or Box Office video monitors or using excerpts of the Documentary during MSG training sessions for employees or during the MSG Tour. Subject to MSG's rights hereunder, Producer shall have all customary editorial control of the Documentary.

11. <u>Credit</u>. MSG shall receive a credit on screen in the end titles of the Documentary in substantially the form "Special Thanks to Madison Square Garden."

12. <u>Miscellaneous</u>. This letter agreement shall be governed by and construed in accordance with the internal laws of the State of New York, and may not be assigned, directly or indirectly, by either party without the prior written consent of the other party. This letter agreement constitutes the entire agreement between the parties and supersedes any and all prior agreements, oral or written, with respect to the subject matter hereof. No change or amendment of this letter agreement shall be valid unless it is in writing and signed by both parties hereto.

If the foregoing is acceptable to you, please sign where indicated below whereupon the terms hereof shall constitute a binding agreement between us.

Very truly yours,

MADISON SQUARE GARDEN CENTER, a division of Madison Square Garden, L.P.

BY: *Robert Russo*

ACCEPTED AND AGREED:

ZIPPORAH FILMS, INC.

By: *Frederick Wiseman*

ZIPPORAH/LETTERS/LICENSE          5