UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X

ZIPPORAH FILMS, INC.,

        Plaintiff,

   v.

MADISON SQUARE GARDEN, L.P.,
MADISON SQUARE GARDEN CENTER, INC.,

        Defendants,

-----------------------------------------------------------X

Index No. 06 CV 6451 (DC)

ECF Case

### DECLARATION OF FREDERICK WISEMAN IN OPPOSITION TO DEFENDANT'S MOTION TO SEAL EXHIBIT D TO THE COMPLAINT

    FREDERICK WISEMAN declares:

    1. I am the General Manager of plaintiff ZIPPORAH FILMS, INC. ("ZIPPORAH" or "plaintiff") and make this declaration in opposition to defendant MADISON SQUARE GARDEN L.P.'s ("MSG" or "defendant") motion to seal the DVD copy of the documentary film entitled *The Garden* that is attached as Exhibit "D" to the Complaint ("*The Garden*" or the "Film"). I have personal knowledge of the facts set forth herein. I oppose MSG's motion because as a filmmaker I am a staunch supporter of the First Amendment and believe that sealing orders are abhorrent to the public's right to access under the First Amendment, and because MSG does not meet the Court's standards for sealing.

    2. The Film is central to the allegations and ultimate determination in this action. I approved the filing of a print of the Film as an exhibit to the Complaint because it was essential that the Court be able to view the Film in order to determine whether or not MSG had

unreasonably withheld its approval to publicly exhibit and distribute the Film. The Court must necessarily view the Film in order to ascertain that MSG's designation of material as confidential was unreasonable.

3. MSG's concern in making the instant motion seems to be based, in part, on the possible failure of the Clerk's office to properly supervise the handling of the DVD copy of the Film. I trust that the Clerk's office would not permit the DVD to be removed and would control copying of it. The Film was filed with the Clerk of the Court on August 24, 2006. Between August and December 2006, MSG filed no objection and as far as I know there was no improper removal or copying of the Film during this time.

4. Further, MSG took no heed of the alleged confidential and proprietary information and the alleged interests of third parties when it sent out copies of the film in January 2005 to numerous third parties who are shown in the film. Robert A. Brandon, MSG's Senior Vice President Legal and Business Affairs, sent out at least five letters, dated January 14 and 31, 2005, to various third parties either enclosing a copy of the Film or indicating that a copy would be sent to them. Exhibit "A." In none of these letters does it indicate the confidential or proprietary nature of the Film, nor that the Film or any scenes in it were to be kept confidential and secret. *Id.* Further, there was no caution to protect the purported interests of the other persons or entities depicted in the Film. Indeed, Mr. Brandon suggested that the third parties "review [the film] in its entirety so as not to miss anything that we may have overlooked." *Id.*

5. *The Garden* is a documentary filmmaker's comprehensive overview of the daily activities and operation of the entertainment complex "Madison Square Garden" ("The Garden"), including its behind the scenes inner workings and diverse forms of public

entertainment such as professional basketball games, professional hockey games, the circus, animal shows and conventions, trade shows, and other events requiring large capacity for audiences. I believe *The Garden* is a work of high artistic merit. My use of images and names in the Film were for an artistic purpose and not for advertising or trade purposes.

6. The idea of filming a documentary about The Garden was first presented to me by Robert Russo, then manager of MSG Facilities, in 1990. Thereafter, in 1997, I met with Mr. Russo and other officers of MSG regarding making a film. After a period of negotiations, ZIPPORAH was granted permission to film activities of The Garden. The negotiations were handled principally by myself for ZIPPORAH and by Mr. Russo, for MSG. Mr. Brandon was only involved in negotiating some of the intricate points.

7. On August 11, 1997, the parties entered into a five-page written agreement (the "Agreement") setting forth the terms and conditions upon which I would be permitted to film activities at The Garden for the purpose of making the Film. The Agreement was signed by Mr. Russo on behalf of MSG, and by myself on behalf of ZIPPORAH. A copy of the Agreement is attached hereto as Exhibit "B".

8. At no time, either during the negotiations or thereafter, did MSG inform me that it had third party agreements that required ZIPPORAH to obtain any special post filming consents and the Agreement did not provide for it. See Exhibit "B." The Agreement only provided for us to obtain the necessary consents required by law, not any consent MSG decided it needed because of so called client relations. Exhibit "B," ¶¶ 4 and 7. MSG has not attached the venue license contracts it purports to now rely on, but in no event can they require me as a documentary filmmaker to obtain the written consents MSG now claims it wants.

9. Commencing in February 1998, and continuing until early April 1998, I along with my crew consisting of a cameraman and an assistant, filmed activities at The Garden on fifty eight consecutive days, producing approximately one hundred ten hours of film with accompanying sound track. All filming was conducted in accordance with the very specific filming procedures contained in the Agreement and in written guidelines from MSG. See Exhibits "B", and copies of three MSG memoranda attached hereto as Exhibits "C", D," and E." Exhibit "C" is a memorandum from Barry Watkins, Senior Vice President Communications, dated February 1998. Exhibit "D" is a memorandum from Robert Goldwater and Barry Watkins to Distribution, dated February 23, 1998. Exhibit "E" is a memorandum entitled "Upcoming Events and Ideas for PBS Documentary" from MSG Entertainment Publicity Group. MSG directed when and where we could operate and assisted us in obtaining necessary consents from filmed events and subjects. See Exhibits "B," "C," "D,"and "E."

10. MSG's public relations ("PR") department assisted me and my crew in obtaining necessary consents for filmed events and subjects by actually going to the events' liaisons and asking for permission for filming and usage. The PR department did this for every event which I filmed, except for the Knicks and the Rangers for which I was given blanket permission. See Exhibits "D" and "E." Indeed, Mssrs. Goldwater and Watkins directed the PR liaison to "*contact an event's promoter/executive/organization about the project to receive the necessary advance permission for filming and usage.*" Exhibit "D" at ¶ 2 (emphasis added). MSG undertook to obtain consents from all events and subjects filmed in advance of the filming, and in every instance informed me that consent had been obtained. The filming was thus conducted with each event's knowledge and consent. Everyone knew I was filming a documentary and that the scenes

could be used in the finished Film.

11. Further, MSG provided me with recommended topics and schedules of events and activities. Exhibit "D" at ¶ 1, and Exhibit "E." I had numerous discussions in this area with Mr. Goldwater, my principal liaison, Mr. Watkins and members of the PR department. Mr. Goldwater, in our daily discussions would also make suggestions as to other meetings, events, and activities not on the schedule which I should film. He was the one who directed me to film the three management scenes at issue herein.

12. After filming at MSG was concluded, I spoke to Mr. Russo several times and explained to him that I had to delay editing the Film because of other projects. He indicated it would not be a problem.

13. Thereafter, in November 2004, MSG unreasonably withheld its approval for me to publicly exhibit and distribute the Film and granted itself an absolute veto and gag order on the Film. See Exhibit "B" at ¶ 10(c). MSG objected to three scenes in the Film involving senior management of MSG, (a) a staff meeting between Mr. Russo and several department heads at MSG regarding labor relations (DVD Disc 1 time 1:18:00 - 1:24:50), (b) a Legal Department staff meeting regarding the labor issues of Toys-R-Us renting space in the Expo Center and negotiations with the union (DVD Disc 1 time 1:39:00 - 1:44:45), and (c) an Executive Committee meeting of MSG senior management regarding a security breach at the Grammy Awards Show (DVD Disc 2 time 0:27:00 - 0:30:50); and a fourth scene taking place at the Mall entry of metal detector screenings. (DVD Disc 2 time 0:21:02-0:22:00). I have included the time codes of the scenes from the DVD copy attached to the Complaint as Exhibit "D" because I believe that these scenes and viewing the Film are essential to the Court's determination.

Nothing said in the scenes is confidential information, especially nearly nine years later.

14. Notably, in its moving papers, MSG did not identify which scenes are confidential and at no time has MSG set forth with any specificity what is confidential or proprietary about the scenes. Rather it relies on general and conclusory allegations. It would appear that MSG simply does not like how it is being portrayed in the scenes.

15. Further, the senior management participants had invited me into the meetings and were aware that we were filming them. At no time did these senior management participants ask me to cease filming or leave the room, as they had a right to do under paragraph 1(b) of the Agreement and MSG's filming procedures. See Exhibits "B," "C," and "D." To the contrary, they assisted me in the filming of these meetings.

16. Moreover, the security measures depicted in the fourth scene taking place at the Mall entry of metal detector screenings are entirely unremarkable and are not confidential. The scene was observed by the public present in the Mall entry who were attending the event. As such the scene is not confidential under the Agreement, because it was "generally available to the public." Exhibit "B," ¶ 8(i). Further, MSG suggested in writing that we film this scene. See Exhibit "E."

17. Contrary to MSG's suggestion, the Agreement does not give it the contractual right to edit or delete footage in the Film. The edits suggested by MSG were not minor, and in effect would gut the scenes and remove from the Film an essential part of the workings of MSG, that of management. This contradicts what MSG's officers, Mr. Goldwater and Mr. Watkins, previously recognized as the "goal" of the Film to "capture the inner workings of our Company," and that the key to the Film was "access to: people, meetings, events and behind the scenes activities which might be taken for granted by most people but would provide Fred with the depth and

texture he is seeking for the film." Exhibits "C" and "D."

18. Moreover, I believe that MSG's sudden demand for written consents from third parties after the fact is a pretext to find a way to stop the Film from being publicly exhibited and distributed. The Agreement does not require ZIPPORAH to obtain written consents, rather it merely provides that it "has or shall obtain any necessary consents that may be required by law," and that it shall not use any third party "without having obtained the necessary consent from such third party." Exhibit "B," ¶¶ 4 and 7. Nor does the Agreement make any reference to an obligation to subsequently obtain written consents from the events filmed after the fact. At no time during negotiation of the contract or during filming was it contemplated or intended that once the Film was completed I would go back and obtain written consents. In making a documentary film, I obtain consents from subjects at or before the filming and not after the fact. That is why, to the extent consents were necessary, MSG obtained approval and permission for me to film events at or before filming.

19. ZIPPORAH and I obtained any necessary consents that were required by law at the time of filming. As stated above at paragraph 10, at or before the filming of each event, MSG obtained the events' affirmative permission and consent for filming and usage, and advised me of this.

20. MSG, without naming the MSG senior official, claims that the issue of consents was raised with me. Declaration of Robert A. Brandon, dated January 10, 2007 at ¶7. However, during the filming neither Mr. Goldwater, who acted as my primary liaison, Mr. Watkins, nor any MSG official made any reference to my contractual obligation to obtain consents of third parties before including their likenesses or performances in the film. Nor at any time was it ever stated

that I had to go back to obtain written consents under MSG's venue license contracts. I have no knowledge of MSG's venue license contracts.

21. It was never intended nor was it my understanding that the Agreement would be used for the purpose being argued by MSG in this motion. Rather the Agreement was to protect inadvertent disclosure of truly confidential or proprietary material, not material from meetings that MSG invited me to film that have no basis for a confidential designation. Moreover, the Agreement does not contemplate that I had to obtain written consents from third parties after the filming was completed. MSG obtained each event's affirmative permission and consent for filming and usage at or before the time of filming, and advised me of this. As such, neither the purported designation of material as confidential nor the consent issue can be the basis for sealing the Film from public access of the Court's judicial process.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on January 22, 2007 at London, England

_____
Frederick Wiseman