UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ZIPPORAH FILMS, INC.,                          :

                 PLAINTIFF,             :

  -AGAINST-                                    :    CASE NO.  06 CV 6451 (DC)

MADISON SQUARE GARDEN, L.P.,                    :
MADISON SQUARE GARDEN CENTER, INC.,             :    **ELECTRONICALLY FILED**

           DEFENDANTS.          :
                                     :

### REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO SEAL EXHIBIT D TO THE COMPLAINT

      Defendant and Counterclaimant Madison Square Garden, L.P. ("MSG") submits this

reply in support of its Motion to Seal Exhibit D to the Complaint.  For the reasons that follow,

Plaintiff Zipporah Films, Inc.'s ("Zipporah") arguments for unsealing Zipporah's purported

documentary (the "Film") should not be credited.

      Lifting the seal now, after MSG has already demonstrated good cause for the Court to

order a temporary seal, would defeat MSG's claim on the merits by rendering the contractual

rights of MSG and its third party clients meaningless.  Zipporah failed in its Opposition to

identify the relative harm in leaving the seal in place at least until this dispute is resolved.

Indeed, each of Zipporah's proffered justifications for unsealing the Film are without merit:

      1) First, Zipporah argues that the Film has already been released to third parties, and thus

MSG has waived any right to confidentiality.  MSG sent the Film to certain third party clients for

the purpose of enabling them to protect their own proprietary rights from being exploited without

their approval.  MSG never made the Film available to the general public.  Further, MSG's third

party clients undoubtedly understood that they were prohibited from publishing the Film, given

that they had no claim to the copyright rights therein.

Dockets.Justia.com

2) Second, Zipporah claims that MSG has not met the legal standard for sealing the Film. Zipporah mistakes this for a First Amendment case. The parties' August 11, 1997 agreement (the "Agreement") makes clear that MSG has the contractual right to withhold approval of the exhibition or distribution of the Film until Zipporah removes any information MSG deems confidential. Even if a presumption of public access to the Film exists, the potential harm to MSG resulting from its disclosure before trial far outweighs any benefit to lifting the seal now.

3) Last, Zipporah asserts that MSG's argument is premised on the view that the Clerk's office would allow citizens to illegally copy the DVD of the Film. On the contrary, like all other matter filed in this Court, the public would have a right to access it absent the seal.

## I.    MSG DID NOT PUBLICLY DISTRIBUTE THE FILM

The notion that MSG waived any right to confidentiality by assisting Zipporah in its attempt to obtain necessary third party consents defies common sense. MSG sent copies of the Film to third party clients pursuant to a contract that *required* those parties to view it. MSG did so on Zipporah's behalf, and at Zipporah's request, for the sole purpose of determining whether or not those third parties would permit the inclusion of their likenesses or proprietary events in the Film. Decl. of Robert A. Brandon at ¶ 13. The letters accompanying those copies show that the exhibition or distribution of the Film for any purpose other than providing or denying the aforementioned consent would violate the copyrights of Zipporah and other parties. *See* Exhibit A to Zipporah Opposition. For example, MSG reminded its clients that Zipporah needed to obtain written consent "from [each third party client] *and other third parties*" before the Film could be distributed. *Id.* at ZFI 0558. MSG further stated that Mr. Wiseman had "authorized us to forward the enclosed copy to you." *Id.* at ZFI 0559. MSG's clients certainly understood that they too would need authorization from Mr. Wiseman and others in order to legally distribute the Film to the public. Wiseman has produced no evidence either that MSG's clients had a different understanding or that any of them actually distributed the Film to third parties .

The cases Zipporah cites in support of its "waiver" argument are inapposite. In *Sherwin Williams v. Spitzer*, the Court determined confidentiality had been waived where any member of

2

the public could collect the information at issue on the Internet. 2005 WL 2128938, *12-14 (N.D.N.Y. 2005). That is not the situation here. Indeed, it is exactly what MSG hopes to avoid. Similarly, *Gambale v. Deutshe Bank AG* involved settlement information that was mistakenly included in a judicial order and was subsequently available on the "highly accessible databases of Westlaw and Lexis and ... disseminated prominently elsewhere." 377 F.3d 133, 144 (2d Cir. 2004). By contrast, MSG delivered the Film only to the parties who had to approve it *before* it could be publicly disclosed. There was no waiver of confidentiality. MSG acted only to preserve the proprietary rights of its clients.

## II.    THERE IS GOOD CAUSE TO MAINTAIN THE SEAL

### A.    Public Disclosure of the Film Would Defeat MSG's Claim on the Merits

Zipporah makes much of the supposed right of access to the Film, but the truth is that most of the footage is irrelevant to the dispute here. At the heart of the case are only scenes to which MSG objects and/or for which permissions have not been obtained. Therefore, the public right of access, which attaches only to documents useful to the judicial process, does not automatically apply to the entire film, certainly not at this stage. *See U.S. v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995) (*Amodeo I*) (a document must be useful in the judicial process for presumption of access to apply).

Even if there is a presumption of public access to the Film, the Court has "considerable discretion in determining whether good cause exists" to overcome it. *Geller v. Branic Intern. Realty Corp.*, 212 F.3d 734, 738 (2d Cir. 2000). MSG has already shown good cause for the Court to seal the Film. First, the Film contains several scenes covering high level meetings among MSG senior executives. Decl. of Robert A. Brandon at ¶ 10. These discussions include labor relations strategies and characterizations of MSG employees, which, if revealed, could result in immediate and lasting damage to MSG's business. *Id.* at ¶¶ 10, 15. Far from being a matter of mere embarrassment, the disclosure of these scenes could alienate employees and disadvantage MSG in future labor negotiations. *Id.* Even though it was not required to do so

under the terms of the Agreement, MSG attempted to negotiate edits to the scenes that would satisfy both parties, and was rebuffed. *Id.* at ¶ 14.

Second, the Film is rife with scenes portraying the likenesses or proprietary events of MSG clients from whom Zipporah never obtained the necessary written consent. *Id.* MSG has standard license agreements with these clients, which, in relevant part, prohibit any "electronic media exploitation" of their events without the prior written consent of both parties. Decl. of Jonathan D. Marcus at ¶ 3. Accordingly, MSG's clients certainly had an expectation and were given express assurances that they would have the opportunity to review any proprietary material before Zipporah included it in the Film. The disclosure of the Film could irreparably damage MSG's relationships with these clients and conceivably lead to additional litigation. Decl. of Robert A. Brandon at ¶ 12.

**B.    Zipporah Understood its Contractual Obligations**

By arguing that the Agreement did not specifically mention Zipporah's obligation to obtain post filming written consent from third parties, Zipporah misses the point. The Agreement is much broader than that. Zipporah had the sole responsibility to obtain *any* necessary consent. See Complaint, Exhibit A, at ¶¶ 4, 7. Mr. Wiseman knew exactly what was expected of him, and it went beyond simply getting permission to turn on his cameras. Decl. of Bobby Goldwater at ¶ 4. Bobby Goldwater, who Mr. Wiseman acknowledges was his primary contact at MSG, reminded him of Zipporah's obligation to seek out event promoters and/or producers *after* filming in order to obtain the required written consent. *Id.* In fact, Mr. Wiseman and his crew gained access to various events at Madison Square Garden precisely because event promoters expected and were assured that they would ultimately have the opportunity to approve the use of any proprietary footage in the Film. *Id.* Indeed, event promoters later confirmed this expectation to Zipporah in writing. Decl. of Jonathan D. Marcus at ¶ 4. At no time did Mr. Goldwater inform Mr. Wiseman that the necessary consent of third parties had been obtained on Zipporah's behalf. Decl. of Bobby Goldwater at ¶ 5.

### III.    Lifting the Seal Would Allow Widespread Public Access to the Film

As a last resort, Zipporah contends that "[t]here is no basis in law or fact" for MSG's concern that lifting the temporary seal could potentially lead to any member of the public viewing the Film or, in the worst case scenario, copying the Film and disseminating it on the Internet or otherwise. Zipporah Opposition, at p. 2. Zipporah is wrong. Members of the public have "a general right to inspect and copy public records and documents, including judicial records and documents." *U.S. v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995). That right is not limited to paper documents. The Court's official website states: "Court records may be requested for viewing and copying between the hours of 8:30 a.m. and 4:30 p.m." http://www1.nysd.uscourts.gov/cases_request_records.php. Moreover, the Clerk of Court's office confirmed that simply by posting some form of collateral, a member of the public would be able to temporarily remove the unsealed DVD from the courthouse file in order to make a copy of the Film. Decl. of Jonathan D. Marcus at ¶ 5.

### IV.    CONCLUSION

For the foregoing reasons, MSG respectfully requests that its Motion to Seal Exhibit D to the Complaint be granted.

Dated: January 29, 2007
      New York, New York

Respectfully submitted,

QUINN EMANUEL URQUHART
OLIVER & HEDGES LLP

s/ Robert L. Raskopf
Robert L. Raskopf (RR 5022)
Jonathan D. Marcus (JM 1885)
51 Madison Avenue, 22nd Floor
New York, New York  10010
212.849.7000

**ATTORNEYS FOR DEFENDANT
MADISON SQUARE GARDEN, L.P.**